1
2          UNITED STATES DISTRICT COURT
3               DISTRICT OF NEVADA
4

5  JESSICA SMITH, *et al.*,              Case No. 2:23-cv-01881-ART-BNW

6                       Plaintiffs,      **ORDER DENYING MOTIONS FOR
                                          SUMMARY JUDGMENT**
7      v.
                                         (ECF Nos. 71, 72)
   CLARK COUNTY, *et al.*,
8
                        Defendants.
9

10        Plaintiffs Jessica Smith and Michael Blake bring this 42 U.S.C. § 1983

11  action against Defendants Clark County and Kevin Carey. Plaintiffs allege that

12  Defendants violated their Fourth Amendment rights and state law when they

13  entered Plaintiff's residence without a warrant on three separate occasions in

14  2022. Defendants seek summary judgment on all claims (ECF No. 71). Plaintiffs

15  seek summary judgment on three of their claims (ECF No. 72). For the reasons

16  stated, the Court denies both motions.

17  **I.  BACKGROUND**

18        Plaintiffs Jessica Smith and Michael Blake are an unmarried couple who

19  live together at the property at issue in this case, 4646 Fuentes Way, Las Vegas,

20  Nevada, 89121. (ECF No. 71-7 at 12–13; ECF No. 72-6 at 12–13.) Blake has

21  owned the property since around 2013. (ECF No. 71-1; ECF No. 72-6 at 20.)

22  Smith and Blake have lived together at the property since approximately 2018.

23  (ECF No. 72-5 at 22.) The property has a small front yard open to public view and

24  a larger yard surrounded by a gate and wall. The property contains a storage

25  shed, a recreational vehicle (RV), and a trailer home. (*See* ECF No. 73 (body-worn

26  camera videos); ECF No. 72-6 at 21; ECF No. 72-5 at 22.)

27        Several months prior to the events of this case, Blake and Smith were

28  staying with Blake's family in Gray Mountain, Arizona. (ECF No. 72-6 at 21–23;

ECF No. 72-5 at 22–23.) Before leaving Las Vegas, Blake turned the power off to the property. (ECF No. 72-6 at 26.) While Smith and Blake were in Arizona, a neighbor told them that some people had been living at their property. (ECF No. 72-6 at 24–25.) Smith returned to Las Vegas around June 16, 2022 (ECF No. 72-5 at 27.) Smith found the "squatters," asked them to leave, and they left. (ECF No. 72-5 at 24.) She discovered that the power was on. (*Id.* at 27.)

On May 26, 2022, NV Energy emailed David Pollex at Clark County Code Enforcement stating that they had found an illegal power connection at the property and a neighboring property, had disconnected the power, and wanted assistance recovering the meter. (ECF No. 72-1 at 46–50; ECF No. 71-2 at 5.) Pollex forwarded the email to "Public Response Info" that day, requesting that the two complaints be processed and noting that "[b]oth manufactured homes appear to be occupied at this time and they now have no active power." (ECF No. 71-2 at 5.) The case was assigned to Kevin Carey on May 26, 2022. (ECF No. 71-2 at 2; ECF No. 72-1 at 50.) Carey contacted the LVMPD Community-Oriented Policing Division to ask for assistance in "accessing the location." (ECF No. 72-1 at 56–57.)

The first and second incidents at issue in this case occurred shortly after Smith returned to the property. The third occurred after Blake returned to the property. There is officer body-worn camera video footage of only the latter two incidents.

## A. First Incident (June 21, 2022)

Smith recalls, in her deposition, waking up on June 21, 2022, to find officers "in [her] bedroom doorway with their guns pointed at [her]." (ECF No. 72-5 at 29.) An officer said to her: "Nobody's supposed to be here. The place is going to be demolished." (*Id.* at 29–30.) As the officer escorted her out, she said: "Why? I live here." (*Id.* at 30.) The officer asked how long she had lived there, but she said she didn't want to answer any more questions. (*Id.*) Officers asked her what

address would be on her ID—since she had recently lost it—and she told them her parents' previous address. (*Id.*) An officer then said: "You have three minutes to grab what you can carry and leave." (*Id.*) She followed their instructions and left. (*Id.*) Shortly after leaving, Smith returned to the property to get some things from the house, walked onto the porch, and saw Carey standing in her living room. (*Id.*) Carey asked if she knew who owned the place, and Smith said Michael Blake. (*Id.*) Carey asked if she had spoken to him, and Smith said she had not been able to get hold of him. (*Id.*) Later, animal control came and took Smith and Blake's cats and dog. (*Id.* at 36–37.) Before leaving the property, Smith noticed that someone had put a lock on the gate. (*Id.* at 32.) According to Smith, nobody told her anything about the power or specifically told her not to return. (*Id.* at 39–40.)

Carey's recollection of events is slightly different. Carey recalls coming to the property with NV Energy and LVMPD officers. (ECF No. 72-1 at 57.) In his deposition, he explained that "usually [in] these situations . . . code enforcement officers stay back" while LVMPD officers enter the property. (ECF No. 72-1 at 57.) Then once LVMPD gives them "the all clear . . . . that's when [code enforcement officers] enter the property and start [their] process." (*Id.* at 58.) In this case, after LVMPD "gave [him] the clear," he went onto the property. (*Id.*) He noticed that the lights were on, "made contact with Jessica Smith" at "the front yard area," and "explained to her that she could not occupy the property without legal power." (*Id.* at 58–59.) He told her that NV Energy was at the property, would be removing the meter, and that she could not occupy the property until power was restored. (*Id.* at 59.) Then, he recalls, LVMPD "allowed her time to gather some belongings, and [] told her to leave." (*Id.*)

Carey describes Smith returning to the property to ask if she could get items off the property, at which point he directed her to LVMPD "because [they were] in control of the property." (*Id.* at 60.) Carey "[didn't] recall being inside the

trailer home." (*Id.* at 75.) Carey recalls going past the front gate, around the back of the property, and observing LVMPD officers opening the storage shed. (*Id.* at 60.) Carey was aware that the officers did not have a warrant to enter the property. (*Id.*) Based on the "policy within the code enforcement office that an occupied structure without power is an imminent danger," Carey considered the property an imminent danger. (*Id.* at 65) However, Carey did not issue a declaration of imminent danger. (*Id.* at 69.) After "the occupant was removed," Carey "secured the property with a lock and chain on the front gate." (*Id.* at 69, 92–93.) Carey told Smith that she could not occupy the property. (ECF No. 72-1 at 94.)

Carey posted a notice of abatement on the property based on the "accumulation of waste and outside storage of materials and equipment." (*Id.* at 84.) Carey was aware that when issuing such notices, the owner is supposed to be given 30 days to abate the nuisance. (*Id.* at 85–86.) Carey did not attempt to contact Blake beyond mailing him a notice of violation regarding the abatement. (*Id.* at 109.)

**B. Second Incident (June 29, 2022)**

Eight days later, on June 29, Carey returned to the property with LVMPD officers and a junk removal service. (ECF No. 72-1 at 87–88.) Again, there was no warrant. (*Id.* at 100.) After finding that the property was again occupied, Carey and the LVMPD officers "removed those persons from the property, and the property was boarded up." (ECF No. 72-1 at 87.)

According to body camera video footage, officers spoke with Carey before entering the property. (Ex. 7 LVMPD 00015 at 14:30:00–14:31:30.) Carey told officers: "I've got these guys here today to board it up." (*Id.*) He told officers: "somebody went back in because my lock is off . . . and they took down all the notices." (*Id.*) When an officer asked if the door was open, he said: "when we were here last time the lock doesn't work." (*Id.*) And the officer responded: "Ok so we

could just push it in." (*Id.*)

Officers then spoke to Smith through the gate at the front of the property and, after she said she didn't have the key to the lock, cut the lock off the front gate. (*Id.* at 14:34:00–14:36:40.) Officers entered the yard, entered the RV through an open door, and searched the RV. (*Id.* at 14:37:00–14:38:30.) Officers then went to the door of the trailer, which was locked. (*Id.* at 14:39:40–14:41:30.) After finding an open window, officers entered the trailer through the window and searched each room inside. (*Id.* at 14:41:30–14:43:40.) Finding nothing inside, they left the property and spoke to Smith outside the front of the property. (*Id.* at 14:44:00–14:44:15.) Carey then went into the property with the contractor, Junkman, who boarded up windows and doors on the property. (*Id.* at 14:45:00– 14:45:20; ECF No. 72-1 at 124–25.)

When Carey came back to the front of the property, an officer asked: "this is trespassing is it not?" (Ex. 7 LVMPD 00015 at 14:46:00–14:46:10.) Carey responded: "you guys warned her last time," and the officers gave Smith a citation for trespass. (*Id.*) Later, an officer asked Carey: "is there another applicable charge that . . . they normally go with when someone re-enters besides trespassing?" (*Id.* at 14:58:28–14:58:36.) Carey responded, "not from us, no" and when asked the follow up question, "so they usually just do trespass," Carey answered in the affirmative. (*Id.* at 14:58:36–14:58:43.)

Carey posted a notice of imminent danger on the property. (ECF No. 71-3; ECF No. 71-4 at 1.) The notice of imminent danger was also mailed to Blake at the property. (ECF No. 71-4 at 2.)

**C. Third Incident (September 27, 2022)**

On September 27, 2022, LVMPD officers and Carey returned to the property for a third time. Before entering the property, the officers and Carey discussed their plan. (Ex. 8 LVMPD 000025 at 16:06:00–16:08:00.) Carey confirmed that Blake could not be on the property "until he satisfies our lien and

1  gets legal power." (*Id.* at 16:07:20–16:07:30.)

2      Officers then proceeded to enter and search an RV parked on the front

3  driveway of the property. (Ex. 8 LVMPD 000026 at 16:17:30–16:20:30.) Officers

4  then opened the gate and entered the property. (*Id.* at 16:20:30.) After knocking

5  on the door of the mobile home, officers opened the bedroom window where they

6  saw Smith and told her to get out of the house. (*Id.* at 16:21:30–16:22:00.) After

7  one officer said they were there on behalf of code enforcement, Blake said: "the

8  power is on legally." (*Id.* at 16:23:00–16:24:00.) The officer responded: "if it's a

9  misunderstanding we can do that" and again asked them to come out of the

10  house. (*Id.*) After explaining to officers that he had paid for power and paid for

11  the lien, Blake exited the house, where an officer handcuffed him and escorted

12  him to the front of the property. (*Id.* at 16:26:00–16:28:00.) At that point Carey

13  came over and spoke to Blake. (*Id.* at 16:28:00–16:31:30.) Blake said that he

14  thought his brother had paid the lien on the property, and when Carey said that

15  he had not, Blake called his brother (while still handcuffed) to ask him to take

16  care of the payment. (*Id.* at 16:28:30–16:38:40.)

17      After thirty minutes of discussion, an officer told another officer: "we're not

18  dealing with this today . . . sounds like this could be an actual misunderstanding

19  through NV Energy where they screwed up . . . they misput . . . where the box

20  was. . . ." (Ex. 8 LVMPD at 16:53:26–16:53:35.) In a case report, Carey

21  commented that: "upon contact with resident he informed us that he did have

22  legal power and has had a meter installed and inspected. [T]his was confirmed by

23  this officer and NV energy. [A]ppears to be a clerical error on NV energy part, had

24  the meter registered to the wrong address." (ECF No. 71-5 at 2.)

25  **D. Procedural History**

26      This case was removed to federal court in November 2023. In October

27  2024, Plaintiffs settled with former defendants Las Vegas Metropolitan Police

28  Department ("LVMPD") and the individually named LVMPD officers, leaving only

Carey and Clark County in this case. (ECF No. 65.) In their Second Amended Complaint, Plaintiffs allege nine claims: (1) violation of civil rights under 42 U.S.C. § 1983 (against Carey only); (2) violation of the Nevada constitution; (3) abuse of process; (4) malicious prosecution; (5) trespass; (6) false arrest/false imprisonment; (7) battery; (8) intentional or negligent infliction of emotional distress; (9) declaratory relief. (ECF No. 39.) All claims except the 1983 claim are brought against both Carey and Clark County.

## II. LEGAL STANDARD

A "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are drawn in the nonmovant's favor. *See id.* at 255. Where a defendant moves for summary judgment based on a claim for which the plaintiff bears the burden of proof, the defendant need only point to the plaintiff's failure "to make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case," *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). For cross-motions for summary judgment, the Court considers each party's evidence without considering which motion provided the evidence. *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011).

## III.    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

In their motion for summary judgment, Defendants argue that Carey did not personally participate in the alleged constitutional violations, that there was no constitutional violation because exceptions to the warrant requirement apply, that Defendants are entitled to discretionary function immunity, and that

7

1    Defendants are entitled to qualified immunity. (ECF No. 71.) The Court addresses

2    each argument in turn.

3    **A. Personal Participation**

4        Defendants argue that Carey did not participate in the alleged

5    constitutional violations because he "merely called LVMPD and told them that he

6    would be declaring a property an imminent danger and securing it as allowed by

7    law so that no one could enter it." (ECF No. 71 at 7.) Defendants assert that Carey

8    cannot be responsible for the LVMPD officers' actions "because he had no legal

9    or actual ability to order the officers to do anything." (*Id.*) Plaintiffs argue that

10   Carey participated by personally intruding onto Plaintiffs' property and directing

11   LVMPD officers to conduct warrantless entries and searches. (ECF No. 80 at 13–

12   15.) In reply, Defendants assert that supervisory liability cannot apply because

13   Carey and LVMPD have different employers. (ECF No. 81 at 3–4.)

14       Liability under § 1983 extends to those officers who are integral

15   participants in a constitutional violation, even if the individual officers' actions

16   do not themselves rise to the level of a constitutional violation. *See Keates v. Koile*,

17   883 F.3d 1128, 1241 (9th Cir. 2018); *Bravo v. City of Santa Maria*, 665 F.3d 1076,

18   1089–90 (9th Cir. 2011). Integral participation requires that an officer be

19   instrumental in effectuating a constitutional violation or have some fundamental

20   involvement in the conduct that caused the constitutional violation. *See*

21   *Hernandez v. Skinner*, 969 F.3d 930, 941 (9th Cir. 2020); *Nicholson v. City of L.A.*,

22   935 F.3d 685, 691–92 (9th Cir. 2019). A person may only be an integral

23   participant if they (1) "knew about and acquiesced in the constitutionally

24   defective conduct as part of a common plan with those whose conduct constituted

25   the violation," or (2) "set in motion a series of acts by others which the defendant

26   knew or reasonably should have known would cause others to inflict the

27   constitutional injury." *Peck v. Montoya*, 51 F.4th 877, 891 (9th Cir. 2022).

28       A supervisory official is liable under § 1983 so long as "there exists either

8

1   (1) his or her personal involvement in the constitutional deprivation, or (2) a

2   sufficient causal connection between the supervisor's wrongful conduct and the

3   constitutional violation." *Rodriguez v. Cnty. of Los Angeles*, 891 F.3d 776, 798

4   (9th Cir. 2018) (internal citation omitted).

5       Defendants rely upon *Jones v. Williams,* 297 F.3d 930 (9th Cir. 2002), and

6   *Felarca v. Birgeneau,* 891 F.3d 809 (9th Cir. 2018), to argue that Carey cannot

7   be held liable for LVMPD's actions. Neither case aids Defendants' position. In

8   *Jones*, the plaintiff appealed after a jury found that officers had not conducted

9   an unreasonable search, arguing that the trial court should have given her

10  proposed jury instructions on "group liability." 297 F.3d at 933–34. The Ninth

11  Circuit rejected the proposed jury instructions, which would have "invite[d] a jury

12  to find all of the officers liable for an alleged constitutional violation merely for

13  being present at the scene of an alleged unlawful act." *Id.* at 936. Here, Plaintiffs

14  do not argue that Carey should be held liable for merely being present at the

15  scene: they argue that Carey was an integral participant and that he directed

16  LVMPD officers to conduct the searches; requirements that *Jones* reiterated. *Id.*

17  at 936 ("either integral participation or personal involvement [is] required before

18  a jury [can] find officers liable").

19      *Felarca* concerned supervisory liability, not personal participation, which

20  is the issue here. *Felarca* involved alleged Fourth Amendment violations for police

21  officers' excessive use of force during a university protest. The Ninth Circuit held

22  that several university administrators who were not in the police "chain of

23  command" were not liable for allegedly excessive force of university police officers

24  during a protest because they had no "supervisory authority" over the officers.

25  891 F.3d at 820. Defendants argue that Carey was not in the "chain of command"

26  of the police officers and therefore cannot be held liable as a supervisor, pointing

27  out that Carey and LVMPD officers have different employers. But the plaintiffs in

28  *Felarca* did not allege that the administrators personally participated in the acts

1    of excessive force.

2    Viewing the facts in the light most favorable to Plaintiffs, there is sufficient

3    evidence to create a genuine issue of material fact as to whether Carey was an

4    "integral participant" in all three of the alleged constitutional violations. Carey

5    initiated all three searches: he requested LVMPD's assistance and coordinated to

6    ensure that they were at the property on all three occasions. As to the first

7    incident on June 21, there is a factual dispute as to whether Carey personally

8    entered Smith's residence: Smith recalls seeing him standing in her living room.

9    Carey also admitted to locking the gate to the property and telling Smith that she

10   could not return to her home. As to the second incident on June 29, Carey

11   consulted with the officers outside the property about the plan and advised them

12   on how to get into the property, explaining that the lock was not functional. After

13   officers searched the property, Carey went into the property with the contractor

14   where he directed the boarding up of Plaintiffs' property. Carey advised officers

15   as they decided to charge her with trespass—of her own home. And on the third

16   incident on September 27, Carey again discussed the plan with officers

17   immediately before they entered the property. He advised them that Blake was

18   not allowed to be on his own property because of the supposed lien and power

19   issues. Viewing the facts in the light most favorable to Plaintiffs, a reasonable

20   juror could find that Carey was an integral participant in each of these alleged

21   constitutional violations.

22   **B. Whether Defendants Violated Plaintiffs' Rights**

23   Defendants next argue that there was no constitutional violation because

24   an exception to the warrant requirement applied as a matter of law. (ECF No. 71

25   at 7–8, 13–16.) Defendants argue that the warrantless search of Plaintiffs' home

26   was justified either due to exigent circumstances or under the "community

27   caretaker" exception. (*Id.*) Plaintiffs argue that whether an exception applies is a

28   question of fact for the jury to consider. (ECF No. 80 at 15–16.) The Court agrees.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. "Warrantless searches of the home or the curtilage surrounding the home are 'presumptively unreasonable.' *Sandoval v. Las Vegas Metro. Police Dep't*, 756 F.3d 1154, 1161 (9th Cir. 2014) (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980)). "To make a lawful entry into a home in the absence of a warrant, officers must have either probable cause and exigent circumstances or an emergency sufficient to justify the entry." *Id.* (citing *U.S. v. Struckman*, 603 F.3d 731, 738 (9th Cir. 2010). "These exceptions to the warrant requirement are 'narrow and their boundaries are rigorously guarded.'" *Id.* (citing *Hopkins v. Bonvicino*, 573 F.3d 752, 763 (9th Cir. 2009)).

The "emergency" exception "stems from the police officers' 'community caretaking function' and allows them 'to respond to emergency situations' that threaten life or limb.'" *Hopkins*, 573 F.3d at 763 (citation omitted). The "exigency" exception "derive[s] from the police officers' investigatory function; it allows them to enter a home without a warrant if they have both probable cause to believe that a crime has been or is being committed and a reasonable belief that their entry is 'necessary to prevent . . . the destruction of relevant evidence, the escape of the suspect, or some other consequences improperly frustrating legitimate law enforcement effort." *Id.*

### 1. Exigency Exception

Defendants argue that the exigent circumstances exception applies because "[w]ith squatters next door and squatters recently occupying the property and making an illegal connection to power, there was a risk of fire from the illegal connection to power grid." (ECF No. 71 at 14.) Their argument fails at the first step because they do not argue that there was probable cause to believe a crime had been committed.

Defendants point to *U.S. v. Echegoyen*, a case which concerned a serious

fire hazard. 799 F.2d 1271, 1280 (9th Cir. 1986). There, the court held that "the existence of an explosive fire hazard and the possibility of illegal drug activity were exigent circumstances that justified the initial warrantless entry." *Id.* at 1278. Officers testified as to "chemical smell, the activity in the cabin, the early-morning hour, the remoteness of the []area, and the limited availability of firefighting." *Id.* at 1278–79. There is no evidence suggesting that similar circumstances existed here. After learning of the illegal power connection, Carey waited almost a month to come to the property. *See United States v. Lindsey,* 877 F.2d 777, 781 (9th Cir. 1989) ("exigent circumstances necessarily imply insufficient time to obtain a warrant"). Carey testified that that the *only* basis he had for declaring the property an imminent danger was a policy that any occupied structure without power is an imminent danger.

Viewing the evidence in the light most favorable to Plaintiffs, none of the three warrantless searches were justified by exigent circumstances.

### 2. Emergency Aid Exception

Defendants' argument that the emergency aid exception applies fails for similar reasons: they do not point to any evidence suggesting that there was an emergency for which Plaintiffs required assistance. They argue, in a conclusory fashion and without citing to the record, that the officers and Carey were "attempting to protect the life and safety of individuals in a dangerous structure before the structure was secured." (ECF No. 71 at 15.) But, again, Carey testified that his only justification for considering the property an imminent danger was a "policy within the code enforcement office" that an occupied structure without power is an imminent danger. He did not issue a declaration of imminent danger until the second incident, and there is no evidence suggesting that Carey believed Plaintiffs to be in danger.

The Ninth Circuit cases that Defendants cite to, *Martin v. City of Oceanside*, 360 F.3d 1078, 1082 (9th Cir. 2004), and *United States v. Bradley*, 321 F.3d

1212, 1214–15 (9th Cir. 2003), are not analogous to this case. In *Martin*, officers came to a residence in response to a phone call from a father "stating that he was urgently concerned for the welfare of his daughter, and that she may be 'in trouble' inside the house." 360 F.3d at 1082. The only reason they were there was to "check the welfare of his daughter" and officers "did no more than search the areas of Martin's home where [she] could potentially be located." *Id.* In *Bradley*, "[t]he possibility of a nine-year old child in a house in the middle of the night without the supervision of any responsible adult [was] a situation requiring immediate police assistance." 321 F.3d at 1215. Defendants' argument that Carey knew that people had lived in the property with illegal power, that people in structures without power might "light fires to stay warm and cook food" (in summer in Las Vegas), and that these fires would "kill occupants and their neighbors" requires far too many logical jumps. (ECF No. 71 at 16.) "Merely hypothesizing about what could happen in the future is not the same as a valid contemporaneous emergency." *Warkentine v. Soria*, 152 F. Supp. 3d 1269, 1283 (E.D. Cal. 2016) (rejecting defendants' arguments that nuisance conditions on a property constituted an emergency).

A reasonable juror could find that the community caretaker exception does not apply. Because Defendants have failed to show that an exception to the warrant requirement applies as a matter of law, there is a factual dispute as to whether Carey violated Plaintiffs' Fourth Amendment rights.

### C. Clearly Established Law

Defendants argue that Carey is entitled to qualified immunity because a reasonable person would not have known his conduct violated clearly established statutory or constitutional rights. (ECF No. 71 at 9.)

In deciding whether officers are entitled to qualified immunity, courts consider whether (1) the facts show that the officer's conduct violated a constitutional right, and (2) if so, whether that right was clearly established at

13

the time. *Tarabochia v. Adkins,* 766 F.3d 1115, 1121 (9th Cir. 2014). As discussed above, Plaintiffs have already demonstrated issues of fact as to whether Carey violated their Fourth Amendment rights on June 21, June 22, and September 27, 2022. Assuming the disputed facts underlying those dates in Plaintiffs' favor, Carey's conduct violated their constitutional rights.

At step two of the qualified immunity analysis, the Court looks to whether Defendants' conduct violated clearly established law. "Even if a government official violates a constitutional right, the official is entitled to qualified immunity unless the violated right was clearly established at the time of the incident." *Andrews v. City of Henderson*, 35 F.4th 710, 718 (9th Cir. 2022). Clearly established means that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

Defendants assert that Carey is entitled to qualified immunity based on the exceptions to the warrant requirement. Alternatively, Defendants assert that Carey is entitled to qualified immunity for his reliance on Clark County Code.

### 1. Exceptions to Warrant Requirement

"Because it is 'clearly established Federal law that the warrantless search of a dwelling must be supported by probable cause and the existence of exigent circumstances' or emergency," Carey is not entitled to qualified immunity unless his entry was justified by one of the two exceptions. *Sandoval*, 756 F.3d at 1161. As addressed above, neither of the two exceptions apply in this case. Therefore, Carey is not entitled to qualified immunity on this ground.

### 2. Reliance on Clark County Code

The Court next considers Defendants' argument that Carey is entitled to qualified immunity because he reasonably relied on Clark County Code ("CCC") to conduct his inspections. It is true that "an officer who acts in reliance on a duly-enacted statute or ordinance is ordinarily entitled to qualified immunity."

*Grossman v. City of Portland*, 33 F.3d 1200, 1210 (9th Cir. 1994). But "an officer who unlawfully enforces an ordinance in a particularly egregious manner, or in a manner which a reasonable officer would recognize exceeds the bounds of the ordinance, will not be entitled to immunity even if there is no clear case law declaring the ordinance or the officer's particular conduct unconstitutional." *Id.* Defendants argue that there is "no clearly established . . . right to occupy a structure" that has been declared to be an "imminent danger" under CCC 11.08.020 or "dangerous building" under CCC 22.12, or where the structure is in violation of the building code (CCC 22.02.067 and others) requiring it "to have lawful power." (ECF No. 71 at 9.) Plaintiffs counter that Carey was not relying upon any specific ordinance but instead relying upon an unwritten policy under which any occupied structure with power is considered an "imminent danger." (ECF No. 80 at 26.)

Defendants' argument that Carey relied on Clark County Code fails for two reasons: first, it is contradicted by Carey's own testimony, and second, it appears that Carey's conduct was not authorized by the various code provisions Defendants cite. In his testimony, Carey explains that he was following a policy which defines "imminent danger" as an occupied structure without legal power. (ECF No. 80-1 at 66.) Carey was unable to point to any written code containing this definition. And Carey did not see any other condition, other than the possible power issue, that he considered an imminent danger. (ECF No. 80-1 at 65–66.)

Defendants contend that Carey's conduct was authorized by two Chapters of the Clark County Code that provide for abatement of dangerous buildings: securing "structures and conditions" that are declared an "imminent danger," Chapter 11.08, and securing and abating buildings that are considered dangerous, Chapter 22.12. The difficulty here is that these ordinances either do not clearly apply or require procedures that Carey did not follow.

It is not clear that Blake's home was a "dangerous building" under Chapter

22.12, which provides for the abatement of dangerous buildings. Section 22.12.130 provides that "[i]f the building or structure is in such condition as to make it immediately dangerous to the life, limb, property or safety of the public or its occupants, it shall be ordered to be vacated, secured, and/or repaired or demolished pursuant to this chapter and/or Chapter 22.02 of the Code of Clark County." CCC 22.12.130(b). Section 22.12.100 provides an extensive definition of "dangerous building." CCC 22.12.100. The code does not define a building without power as dangerous, and the code does not make any reference as to whether a building is occupied or not. *See id.*

The code provision on securing a building deemed to be an "imminent danger" requires procedures, including a committee finding and notice to the owner, that were not followed here. Section 11.08.020 provides that, generally, a notice and declaration of imminent danger must be issued before securing a building. Generally, "three or more members of a danger determination committee" must "meet and determine that a structure or condition is imminently dangerous" before "order[ing] the owner . . . to secure such structure or condition and use reasonable means to secure such structure or condition if the owner fails to do so." CCC 11.08.020(a). There is no evidence in the record suggesting that such a meeting took case or that Carey first ordered the owner (Blake) to secure the property before doing it himself. Carey admits that he did not issue a notice of imminent danger upon his first inspection of the property, on June 21, 2022, instead removing Smith from the property and securing it. (ECF No. 80-1 at 69.)

There is no evidence that that Carey complied with the code authorizing summary abatement. Subsection (c) of CCC 11.08.020 sets out an exception which Defendants appear to be relying upon (at least to justify the first search), under which if it is determined that "the result of the imminent danger is likely to occur before the notice and an opportunity to challenge the action can be provided pursuant to this section," the structure "may be summarily abated" only

16

"to the extent necessary to remove the imminent danger that presents an immediate hazard." CCC 11.080.020(c). There is no evidence in the record suggesting that such a finding was made.

Here, assuming facts in Plaintiffs' favor, Carey's actions fall outside the enforcement authority of the municipal ordinance that Defendants rely upon. *See Cuviello v. City of Vallejo,* No. 16-CV-02584-KJM-KJN, 2020 WL 6728796, at *11 (E.D. Cal. Nov. 16, 2020) (officer not entitled to qualified immunity where actions were not authorized by the municipal ordinance they relied upon). On June 21, 2022, Carey was clearly exceeding the bounds of Section 11.08.020 when he failed to provide notice before securing the property or make the determination necessary for an exception to the notice requirements. And on all three occasions, Carey cannot have been acting in reliance upon Chapter 22.12 because no section in that chapter provides the stated authority for his decision to consider the property an "imminent danger" based solely on the fact that it was an unoccupied structure without power.

Because a reasonable officer would recognize that Carey's conduct exceeded the bounds of Clark County Code, Carey is not entitled to qualified immunity. *See Grossman*, 33 F.3d at 1210; *see also Lechner v. LVMPD,* 696 F. Supp. 3d 963, 1005–06 (D. Nev. 2023) (officers not entitled to qualified immunity on Fourth Amendment claim where they enforced Clark County Code in a "particularly egregious way and exceeded its bounds"); *Tarabochia*, 766 F.3d at 1128 (officers not entitled to qualified immunity on Fourth Amendment claim where neither statutory provision that defendants relied upon authorized stop); *Cuviello*, 2020 WL 6728796, at *11 (officer not entitled to qualified immunity where conduct fell outside enforcement authority of municipal ordinance provided to him).

Because there is a genuine dispute as to whether Carey personally participated in violations of Plaintiffs' Fourth Amendment rights, and because

Carey is not entitled to qualified immunity, the Court denies Defendants' motion for summary judgment on Plaintiffs' § 1983 claim.

### D. STATE LAW CLAIMS

In addition to their federal constitutional claim, Plaintiffs allege a series of state law claims against both Carey and Clark County, including violation of the Nevada constitution, abuse of process, malicious prosecution, trespass, false arrest/false imprisonment, battery, intentional or negligent infliction of emotional distress, and declaratory relief.

#### 1. Discretionary Immunity

Defendants assert that they are immune from tort liability under discretionary function immunity under NRS 41.032(2), relying exclusively on *Ransdell v. Clark County*, 192 P.3d 756 (Nev. 2008). (ECF No. 71 at 9–10.) Plaintiffs argue that discretionary function immunity does not apply because "agents do not have discretion to violate the Constitution." (ECF No. 80 at 20–22 (quoting *Martinez v. United States*, 997 F.3d 867, 877 (9th Cir. 2021)).

NRS 41.032(2) grants the State and its political subdivisions sovereign immunity from civil liability when the challenged act was discretionary in nature. *Ransdell*, 192 P.3d at 761. Nevada has adopted the federal *Berkovitz-Gaubert* test to determine what acts of a state actor qualify for discretionary-function immunity. *Martinez v. Maruszczak*, 168 P.3d 720, 722 (Nev. 2007). Under that two-part test, "government actions fall within the scope of discretionary-act immunity when they (1) 'involve an element of individual judgment or choice,' and (2) are 'based on considerations of social, economic, or political policy.'" *Ransdell*, 192 P.3d at 762. However, the Ninth Circuit has recognized that discretionary function immunity does not protect unconstitutional government conduct. *Nurse v. United States*, 226 F.3d 996, 1002 (9th Cir. 2000); *see also Martinez*, 997 F.3d at 867.

Plaintiffs do not appear to contest that Carey's actions involved an element

of individual judgment or choice. (ECF No. 80 at 23.) In *Ransdell*, the Nevada Supreme Court found that the Clark County abatement procedure "required the inspectors to use their own judgment and conduct individual assessments of the conditions on [the plaintiff's] property to determine if abatement was required under the Clark County Code." 192 P.3d at 763. Here, too, Carey's actions involved individual judgment.

Under the second part of the *Berkovitz-Gaubert* test, the discretionary action must be "based on considerations of social, economic, or political policy." *Id.* "The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *United States v. Gaubert,* 499 U.S. 315, 325 (1991). In *Ransdell*, the Court found that "strong public policy considerations related to public health, safety, and welfare are associated with abatement procedures generally." 192 P.3d at 762. But in making that finding, the court pointed to specific provisions of Clark County Code which authorized the abatement actions at issue. *Id.* And the court noted that it was "clear from the record that the County's abatement followed County Code provisions." *Id.* at 759.

Here, by contrast, there is evidence suggesting that Carey did not follow the County Code provisions that Defendants rely upon, as explained above. And there is a genuine dispute of material fact as to whether his failure to do so violated Plaintiffs' Fourth Amendment rights.

Because Defendants' arguments for dismissing each of Plaintiffs' state law claims are all based on discretionary act immunity or qualified immunity, the Court denies Defendants' motion for summary judgment on each of those claims.

## IV. PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs seek summary judgment against Defendants for (1) the Fourth Amendment violation, (2) the associated Nevada constitution violation, and (3)

trespass. Plaintiffs argue that summary judgment is appropriate because two of the three incidents were captured by body camera footage. (ECF No. 72 at 2.)

For the reasons discussed above, there are genuine issues of fact as to whether Carey personally participated in the alleged Fourth Amendment violations. First, as Plaintiffs note, there is no body camera footage of the June 21, 2022, incident, and, viewing the facts in the light most favorable to Carey, a reasonable juror could find that Carey did not personally participate in the search. There are also factual disputes as to what extent Carey participated in the events of June 29, 2022, and September 27, 2022.

Plaintiffs' arguments for the Nevada constitutional claim and the trespass claim are the same, and therefore the same result follows. (*See* ECF No. 72 at 17–18 ("if Carey is found to have violated the Fourth Amendment or the Nevada constitution's analogous rights he has also, by definition, committed trespass").

## V. CONCLUSION

For the foregoing reasons, the Court DENIES Defendants' motion for summary judgment (ECF No. 71).

The Court DENIES Plaintiffs' motion for partial summary judgment (ECF No. 72).

DATED: August 15, 2025

_____
ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE

20